UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

*In re*:                                                    Case Number: 21-10140-7

    JARED T. TRAPP,

              Debtor.

    VELOCITY CAPITAL GROUP, LLC,

              Plaintiff,
      v.                                         Adversary Number:  21-19

    JARED T. TRAPP,

              Defendant.

## **DECISION**

The Debtor, Jared T. Trapp ("Trapp"), filed a voluntary Chapter 7 petition on January 26, 2021. Velocity Capital Group, LLC ("VCG") filed an adversary proceeding seeking a determination that Trapp's debt to Plaintiff VCG is nondischargeable under 11 U.S.C. § 523(a)(2)(B) and 523(a)(6). Following the close of evidence at trial, VCG moved to amend to include a claim under 11 U.S.C. § 523(a)(2)(A) to conform to the evidence.

### **BACKGROUND FACTS**

VCG specializes in providing working capital to businesses. It typically does this by purchasing an interest in the revenue stream of the business.

Trapp is the sole owner of Trapp Enterprises, LLC, d/b/a Dickey's BBQ Pit ("Trapp Enterprises"), and BBQ Trapp, LLC, d/b/a Butcher's Block Barbeque ("BBQ Trapp"). Until January 2020, Trapp Enterprises and BBQ

Trapp operated both a barbeque restaurant and a food truck in Eau Claire, Wisconsin.

VCG received an application for funding from Trapp Enterprises on September 4, 2019. The application was signed by Trapp as sole owner of Trapp Enterprises. The application represented that Trapp Enterprises' annual gross sales were $500,000, monthly sales were $39,000, and monthly credit card sales were $15,000 to $25,000.

Five days later, BBQ Trapp applied for funding. That application stated that BBQ Trapp's annual gross sales were $500,000.

Trapp operated both the building restaurant location and the food truck. He said the funds would be used to (1) upgrade equipment, (2) purchase new equipment, (3) expand the business, and (4) buy and upgrade catering equipment. Instead, the funds were used to pay payroll, tax liabilities, vendors, credit cards, and the Dickey's BBQ Pit franchisor. VCG says Trapp was asked whether there were other debts they should be aware of and Trapp said no. Trapp did mention a 2011 tax lien but said it had been released. He says he did not mention any debts or liens because he had disclosed it to the broker he was dealing with, and he denies that VCG asked about any debts. He admits owing both the Wisconsin Department of Revenue ("WDOR") and the Internal Revenue Service ("IRS"). These obligations were not disclosed to VCG.

Less than two weeks later, VCG entered into a Revenue Purchase Agreement with Trapp Enterprises. VCG bought $50,400 in Receipts from Trapp Enterprises. "Receipts" are defined in the Revenue Purchase Agreement

2

as "all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course" of Trapp Enterprises' business. Trapp executed a personal Guaranty of Performance of Trapp Enterprises' obligations under the Revenue Purchase Agreement. VCG was granted a security interest in the Receipts it bought from Trapp Enterprises.

On the same day, VCG entered into a Revenue Purchase Agreement with BBQ Trapp under which VCG bought $43,200 in Receipts from BBQ Trapp. Trapp executed a personal Guaranty of Performance of BBQ Trapp's obligations under the Revenue Purchase Agreement. VCG was given a security interest in the Receipts it bought from BBQ Trapp.

Payments to VCG were to be made by daily ACH remittance. The ACH payments were made until October 15, 2019. On that date, Trapp instructed his bank to stop all payments to VCG. The WDOR and IRS obligations were paid with Receipts after the loan from VCG.

One month after VCG provided the funding, Trapp Enterprises defaulted on its obligations to VCG, and Trapp defaulted on his obligations under the Guaranty. At the same time, BBQ Trapp also defaulted on its obligations to VCG, and Trapp defaulted on his obligations under the Guaranty.

About two weeks before stopping the payments to VCG, Trapp contacted a company known as RAM. Trapp says the cost of goods increased, sales decreased, and there were some equipment problems at the time, so he had issues making operating expenses while remitting to VCG. He says RAM alleged it would assist with the business debts owed. Further, he says RAM told him to

stop paying VCG, so he did. Instead, in October Trapp Enterprises made payments to RAM totaling $4,397.96 and BBQ Trapp made payments to RAM of $2,016.70. There is no evidence any of the payments to RAM were used to pay VCG or any other creditor.

Then in November or December, BBQ Trapp decided to pursue another loan against its revenue. It applied through a loan broker to VCG. It also sought funding from Everest Business Funding ("EBF"). Trapp described this as a "Hail Mary" to save the businesses. BBQ Trapp did enter into an agreement with EBF. As part of that agreement, BBQ Trapp pledged the Receipts and agreed to regular ACH payments to EBF. BBQ Trapp made 27 payments of $231.45 to EBF in December and early January. The payments totaled $6,249.15 and were from the Receipts.

Around four months later, Trapp Enterprises and BBQ Trapp stopped operating. Between the time the payments to VCG were stopped and the businesses were closed, BBQ Trapp had receipts of $97,734 and Trapp Enterprises had receipts of $107,954. These funds were used to pay RAM, EBF, the tax liabilities that were not disclosed by Trapp, payroll, vendors, credit cards, and the Dickey's BBQ Pit franchisor.

Trapp says he did not intend to close the business when he borrowed from VCG. He knew BBQ Trapp was on its way to failure and that the revenue and business of Trapp Enterprises was waning. He wanted to "jump start" the businesses. While he knew the businesses might fail, he thought borrowing money might be a "Hail Mary" to save the businesses.

**JURISDICTION**

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Western District of Wisconsin has referred all of its bankruptcy cases to the Bankruptcy Court for the Western District of Wisconsin.

A bankruptcy judge to whom a case has been referred has statutory authority to enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or sua sponte, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). The bankruptcy court may hear and determine such matters. 28 U.S.C. § 157(b)(1).

**DISCUSSION**

A.  Plaintiff's request to amend the pleadings to conform to the evidence pursuant to Fed. R. Civ. P. 15(b)(2)

As a preliminary matter, VCG moved at the conclusion of the trial to amend its complaint to conform to the evidence and add a claim against Defendant arising under 11 U.S.C. § 523(a)(2)(A). VCG argues that it is able to amend its claim pursuant to Federal Rule of Civil Procedure 15(b)(2), which

permits the amendment of a complaint during trial if "issues not raised by the pleadings are tried by express or implied consent." In deciding whether to permit the movant to amend the pleading, a court must determine "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Aldridge v. Forest River, Inc.*, 635 F.3d 870, 875 (7th Cir. 2011) (citing *In re Rivinius, Inc.,* 977 F.2d 1171, 1175 (7th Cir. 1992)).

As support for its section 523(a)(2)(A) claim, VCG believes that the evidence presented at trial shows Trapp obtained the debt from VCG through false representations. Specifically, VCG points to testimony that while Trapp told VCG the funds were going to be used for equipment and upgrading catering, he actually intended to use the funds for payroll, taxes, and operating expenses. According to the testimony of VCG's owner, VCG felt more secure knowing how the funds were going to be used. VCG argues the testimony of both Trapp and VCG's owner shows the funds were not used for its intended purpose.

Trapp had a fair opportunity to defend against this potential section 523(a)(2)(A) claim. For instance, the section 523(a)(2)(A) claim is based largely on testimony of Trapp and VCG's owner that was subject to direct and cross-examination. Further, VCG's attorney stated she told Trapp's attorney that if certain evidence came out at trial, VCG would amend its pleadings to add this additional claim. Though Trapp's attorney objected to the request to amend, he did not state a basis for the objection. He also did not dispute the statement

6

during Plaintiff's closing that he was on notice of a possible amendment.

Consequently, there is nothing on the record that suggests Trapp did not have

a fair opportunity to defend or that he would have presented additional

evidence had he known sooner the substance of the amendment. Therefore this

Court will permit VCG to amend its complaint to conform the evidence and add

a claim against Defendants arising under 11 U.S.C. § 523(a)(2)(A).

B.  <u>Discharge exceptions are narrowly construed</u>

Discharge exceptions under section 523(a) are construed narrowly to

further a key objective of the Bankruptcy Code—to grant honest debtors a fresh

start. *See Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 275-76 (2013)

("[E]xceptions to discharge should be confined to those plainly expressed . . .

where strong, special policy considerations, such as the presence of fault,

argue for preserving the debt, thereby benefiting, for example, a typically more

honest creditor.") (internal citations omitted).

C.  <u>Nondischargeability under 11 U.S.C. § 523(a)(2)(A)</u>

Section 523(a)(2)(A) excepts from discharge "any debt . . . for money . . .

to the extent obtained by . . . false pretenses, a false representation, or actual

fraud, other than a statement respecting the debtor's or an insider's financial

condition." 11 U.S.C. § 523(a)(2)(A). Although courts sometimes suggest

otherwise, the statute describes three separate grounds for holding a debt to be

nondischargeable: false pretenses, false representation, and actual fraud. *City

of Chicago v. Spielman (In re Spielman)*, 588 B.R. 198, 204 (Bankr. N.D. Ill.

2018); *Bd. of Educ. v. Monarrez (In re Monarrez)*, 588 B.R. 838, 858 (Bankr. N.D. Ill. 2018).

To state a claim under section 523(a)(2)(A), a creditor must allege that (1) the debtor made a false representation he either knew was false or made with reckless disregard for its truth; (2) the debtor made the false representation with intent to deceive or defraud; and (3) the creditor justifiably relied on the false representation.

Trapp represented to VCG that the money would be used to expand the business, purchase new equipment, and upgrade catering equipment. His testimony that he did use the funds for the stated purposes was incredible. The bank records and testimony confirm it was not used for those purposes. Instead, Trapp admits he needed the money to pay payroll, vendors, and other operating expenses including tax liabilities. None of those uses were disclosed to VCG.

Appling the law to the facts, the Court draws these conclusions:

- BBQ Trapp, Trapp Enterprises, and Trapp owe $93,310[1] to VCG for loans given to the entities and guaranteed by Trapp.

- Trapp represented that BBQ Trapp and Trapp Enterprises would use the funds from VCG to purchase and upgrade equipment and to expand their businesses.

- The representations were untrue.

---

[1] In his schedules, Trapp concedes VCG is owed at least $80,460. This does not include the $5,000 in additional default fees from each entity or costs and attorney's fees.

- Trapp did not intend for BBQ Trapp or Trapp Enterprises to use the funds for the purposes represented to VCG.

- Trapp knew the representations were untrue.

- The funds were not used for the purposes represented to VCG.

The representations by Trapp were not about the financial condition of his businesses but were about the specific need for and intended use of the money being borrowed. The representations were of present facts—the use of the money—and not mere promises. The representations were untrue. Trapp knew the stated uses were false.

When a creditor lends money to be used "for a specific purpose and the debtor has no intention of using it in that manner, a misrepresentation exists upon which a debt can be held non-dischargeable." *In re Sheridan*, 57 F.3d 627, 635 (7th Cir. 1995) (citing *In re Pappas,* 661 F.2d 82, 86 (7th Cir. 1981)). Moreover, proof that the Debtor never put the money toward the stated purpose allows a court to infer the requisite intent. *Id.*

The representations that the use of the funds would be to upgrade equipment and expand businesses that were said to have annual sales of $500,000 each and that payment would be made daily from receipts justified the reliance of VCG on the Debtor's statements.

The debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

D.  Nondischargeability under 11 U.S.C. § 523(a)(2)(B)

Section 523(a)(2)(B) excepts from discharge debts for obtaining money, property, or services through the use of a false financial statement. The

creditor must prove by a preponderance of the evidence that the debt was obtained by the use of a statement: (1) in writing, (2) that is materially false, (3) respecting the debtor's or an insider's financial condition, (4) on which the creditor to whom the debtor is liable . . . reasonably relied, (5) that the debtor caused to be made or published with the intent to deceive. *Insurance Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1114 (3d Cir. 1995). "Materially false" means misrepresentation of information that "would normally affect the decision to grant credit." *Community Bank of Homewood v. Bailey (In re Bailey)*, 145 B.R. 919, 930 (Bankr. N.D. Ill. 1992). To prove intent, the creditor must either show the debtor made the false statements knowingly or with reckless disregard for the truth. *Cohn*, 54 F.3d at 1119.

VCG argues that the debt arising under the Trapp Enterprises agreement is nondischargeable under section 523(a)(2)(B). VCG alleges that the "funding application was materially false" because, while the funding application states that Trapp Enterprises' monthly sales were $39,000 and that monthly credit card sales were $15,000 to $25,000, Trapp testified at the Section 341 Meeting that the average gross monthly sales for Trapp Enterprises were $23,000 and the average gross credit card sales were between $4,000 and $5,000 per month.

In response, Trapp disagrees that the written funding application contained false sales information. Trapp asserts he did not provide false information either in writing to VCG or at his 341 Meeting of Creditors.

According to Trapp, the figures provided in his funding application to Plaintiff were based on his best estimate of his previous months' sales.

Three of the elements of section 523(a)(2)(B) are met:

1. The debts were obtained by use of a statement in writing. VCG based its decision to provide funding, at least in part, on the information provided in the written application to VCG by Trapp Enterprises and BBQ Trapp and signed by Trapp as sole owner.

2. Both Trapp Enterprises and BBQ Trapp qualify as insiders as defined in section 101(a)(31) of the Bankruptcy Code because they are entities in which Trapp is a director, officer, or person in control. Trapp is also the sole owner. The writing also concerns the debtor's or an insider's financial condition. The applications list monthly sales and credit card sales for Trapp Enterprises and annual sales for BBQ Trapp.

3. VCG reasonably relied on the statements in the applications. It conducted telephone interviews with Trapp about the transaction when it received the applications. VCG states that had it been provided with the correct monthly sales information it would have impacted VCG's decision to provide the funding. Thus VCG's decision to provide credit was at least partly based on information stated in the application.

So the nondischargeability of Trapp's debt under section 523(a)(2)(B) turns on two remaining elements: (1) whether the writing was materially false, and (2) whether the Debtor intended to deceive.

11

The first issue is whether the writing was materially false. No direct evidence was presented at trial that in the months before the application the sales information was materially less than represented.

Trapp says the sales amounts were based on his best estimate of his previous months' sales. Trapp Enterprises' 2018 Schedule C also reflected a $500,000 annual sales amount.

Further, the testimony and exhibits mostly focused on the time after the application. In October—the month after the transactions with VCG—the deposits by Trapp Enterprises were $47,021.31 and those of BBQ Trapp were $34,891.23. A change in the monthly sales information provided may have impacted VCG's decision to provide the funding or provide less funding. Still, there was no evidence provided that the statements were untrue based on the information Trapp used for the application.

Knowing the businesses needed a "jump start" or that certain tax payments were past due is not enough to prove the revenue amount was materially false. Other explanations were provided by Trapp about changes that might explain the diminishing revenue—"people just stopped coming in," there were continuing problems with his landlord not keeping promises, and the cost of goods sold increased. Many of these may have happened both before and after the VCG transaction.

VCG did not establish that the representation based on prior months was materially false.

The second issue is whether there was an intent to deceive. The question of intent is an intense one of fact. The debtor's credibility is a critical factor. *Colchester State Bank v. Phillips (In re Phillips)*, 367 B.R. 637, 645 (Bankr. C.D. Ill. 2007). Based on the evidence presented, though, it is hard to determine whether Trapp intended to deceive VCG about the revenues of his businesses.

The lower amounts stated at the Section 341 Meeting were from the months just before the filing of the bankruptcy. Those were after the transaction with VCG.

While Trapp knew when he filled out the application that his businesses were at risk and facing difficult and changing financial times, that is not enough to demonstrate the information provided was materially false or that the statements about prior months' earnings were made with intent to deceive. So VCG failed to establish by a preponderance of the evidence two of the required elements for nondischargeability under 11 U.S.C. § 523(a)(2)(B), and that claim is denied.

E.  Nondischargeability under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) provides that a debt is nondischargeable if it was incurred through willful and malicious injury by the debtor. To show willful and malicious injury, VCG must show: (1) Trapp acted willfully, (2) Trapp acted maliciously, and (3) Trapp's willful and malicious actions injured VCG or its property. *Owens v. Powell (In re Powell)*, 567 B.R. 429, 434 (Bankr. N.D.N.Y. 2017). Willful and malicious are separate elements that must be independently proven. *Id.*

"Willful" means deliberate or intentional. *Associated Bank, N.A. v. Graham (In re Graham)*, 472 B.R. 524, 530 (Bankr. W.D. Wis. 2012) (citing *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998)). Willfulness requires more than just negligence, or even recklessness. *Id.* The creditor must prove that the debtor subjectively intended to injure it or knew that injury was "substantially certain" to result. *Graham*, 472 B.R. at 530 (citing *In re Neale,* 440 B.R. 510, 520 (Bankr. W.D. Wis. 2010)). To meet the standard for willfulness, VCG must show "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Geiger*, 523 U.S. at 61-62 (emphasis in original).

Maliciousness has generally been held to encompass "implied or constructive malice as well as actual malice." *In re McGuffey*, 145 B.R. 582, 586 (Bankr. N.D. Ill. 1992). Implied malice may be shown "by the acts and conduct of the debtor in the context of [the] surrounding circumstances." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 88 (2d Cir. 1996); *see also In re Ikner*, 883 F.2d 986, 991 (11th Cir. 1989) ("Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice."). An act is "malicious" under section 523(a)(6) if it is taken "in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994); *Bukowski v. Patel*, 266 B.R. 838, 844 (E.D. Wis. 2001). This Court has required that "the debtor know that his act will harm another and proceed in the face of that knowledge." *Farmers Implement Store of Mineral Point, Inc. v. Jorenby (In re Jorenby),* 393 B.R. 663, 666 (Bankr. W.D. Wis.

2008). Under this standard, there must be actual knowledge; a finding that the debtor should have known that harm would result will not suffice. *In re Cullen*, 71 B.R. 274, 282 (Bankr. W.D. Wis. 1987).

The Seventh Circuit has defined willful and malicious injury as one that "the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012).

Bankruptcy courts in the Seventh Circuit have held that the phrase "willful and malicious injury" under section 523(a)(6) encompasses willful and malicious conversion. *See Graham*, 472 B.R. at 530-31; *see also In re Meyer*, 7 B.R. 932, 933 (Bankr. N.D. Ill. 1981); *In re Aldrich*, 37 B.R. 860, 862 (Bankr. N.D. Ohio. 1984). Courts that have ruled on this issue have found that "[f]or a willful and malicious conversion to create a non-dischargeable debt, there must be a deliberate or intentional act, done with intent to do harm to the creditors' property." *In re Meyer*, 7 B.R. at 933.

Finally, in Wisconsin a claim for conversion can be established when a defendant (1) controlled or took property belonging to another, (2) without the owner's consent, and (3) in a manner that seriously interfered with the owner's rights to possess the property. *Dealer Servs. Corp. v. Erb (In re Erb)*, 453 B.R. 914, 920-21 (Bankr. W.D. Wis. 2011) (citing *Knox Enterprises, Inc. v. Jetzer,* No. 2009AP1671, 2010 WL 1881943 (Wis. Ct. App. May 12, 2010)). Conversion, as a cause of action, "is bottomed upon a tortious interference with possessory rights." *See Production Credit Ass'n of Chippewa Falls v. Equity Coop Livestock*

15

*Sales Ass'n,* 82 Wis. 2d 5, 10, 261 N.W.2d 127 (1978). Tortious conversion

"may be committed in a variety of ways, the most common being an

unauthorized transfer of the goods to one who is not entitled to them . . . . The

plaintiff in a conversion suit . . . must allege and prove either that it was in

possession of the [collateral] at the time of the conversion or that it was entitled

to immediate possession." *Id.*

VCG alleges that Trapp willfully and maliciously converted VCG's

property. VCG asserts that Trapp knew that VCG owned the Receipts and that

it held security interests in the Receipts. Trapp signed the Trapp Enterprises

and BBQ Trapp Agreements, both of which provide the transaction is a sale of

Receipts, and both identify VCG's security interests in the Receipts. Under

those Agreements, Trapp agreed to sell $50,400 of Trapp Enterprises Receipts

and $43,200 of BBQ Trapp Receipts to VCG as the "absolute owner." Thus,

VCG believes Trapp willfully and maliciously converted VCG's property when

Trapp Enterprises and BBQ Trapp continued to operate and generate Receipts

from October 2019 to January 2020 without turning over the Receipts to VCG.

During that period of time, Trapp Enterprises generated revenue totaling

$107,954. BBQ Trapp had receipts totaling $97,734.[2]

VCG asserts that Trapp knew that failing to turn over the Receipts was

wrongful and certain to cause harm to VCG because Trapp knew that VCG

owned the Receipts and had a security interest in the Receipts. A mere two

---

[2] The revenue amounts are adjusted to deduct return items, transfers between
accounts, and uncollected revenue.

16

weeks after taking money from VCG, Trapp talked to RAM and then, a week later, he stopped payments to VCG. Additionally, Trapp used the Receipts to make payments to RAM, borrowed from and pledged the Receipts to EBF, and made payments from the Receipts to EBF. Those payments were not ordinary or customary expenses of BBQ Trapp or Trapp Enterprises.

In response, Trapp simply says his failure to pay over the Receipts to VCG and to terminate the ACH payments was not "willful" and "malicious." That is, he says, because he did not intend to cause harm to VCG.

Trapp's actions constitute conversion under Wisconsin law. Conversion may be shown when the plaintiff was entitled to immediate possession. VCG bought the Receipts. It also held validly perfected security interests. While daily remittance amounts were permitted, when Trapp terminated the ACH payments, all the Receipts and unpaid amounts became immediately due and payable.

Section 409.609(1)(a), Wis. Stat., provides that "[a]fter default, a secured party . . . [m]ay take possession of the collateral." Both Revenue Agreements also state VCG can enforce its rights.

Trapp's failure to remit the Receipts shows willfulness. Trapp was making daily payments to VCG and then abruptly stopped on October 15, 2019. Instead, he made payments to RAM for its advice to stop paying VCG. The VCG owner credibly testified that when the ACH payments were  stopped many attempts were made to contact Trapp to no avail. Not only were the payments stopped, but Trapp changed credit card processors.

17

Trapp's testimony that he contacted VCG but they "were rude" so he hung up was disingenuous. He said if they wanted money they should say so but if it was receipts they wanted he would "send you paper." This further undermined any credibility of his testimony or feigned lack of understanding that VCG owned the Receipts. He admitted he knew the account would be debited under the Agreements and still told the bank to reject the ACH debits. He knew that VCG had purchased the Receipts and were entitled to payment from those collections. The default was deliberate and intentional and thus falls under the definition of "willful" as this Court defines it. *Graham*, 472 B.R. at 530.

Whether Trapp's actions were malicious is a closer call. Based on the evidence presented at trial, Trapp's actions satisfy the Seventh Circuit's definition of "malicious." An act is "malicious" under section 523(a)(6) if it is taken in "conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *In re Thirtyacre*, 36 F.3d at 700; *Bukowski v. Patel*, 266 B.R. at 844. Trapp consciously stopped making payments to VCG despite the Revenue Purchase Agreements that Trapp Enterprises and BBQ Trapp entered into with VCG a month before the default. He knew he was using and selling the Receipts of BBQ Trapp and Trapp Enterprises. He knew they were entitled to payment and turnover of those Receipts. He was aware the Receipts he used to pay RAM belonged to VCG. He also knew that VCG owned those Receipts when he borrowed from and pledged Receipts to EBF.

18

The Receipts collected by Trapp Enterprises and BBQ Trapp from October 15 to the close of business were sufficient to have paid VCG in full. VCG's owner testified that the failure to make those payments resulted in a reduction of funds available for VCG to lend other merchants. VCG sustained losses as a result of the refusal of Trapp to remit Receipts.

No evidence of just cause or excuse was presented by Trapp. The suggestion he made that he was trying to keep the businesses open and did not intend to close is not just cause or excuse.

This Court has not defined "just cause or excuse," nor has any other bankruptcy court in the Seventh Circuit. The Ninth Circuit defined "just" in the context of a section 523(a)(6) maliciousness analysis as "honorable and fair in dealings and actions," "consistent with moral right," and "valid within the law." *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 792 (9th Cir. 1997). The Bankruptcy Appellate Panel of the Sixth Circuit has held that "[t]o determine whether there is 'just cause or excuse,' a court 'must look . . . to the surrounding circumstances to divine whether there was some legitimate (or equitable) justification for the debtor's conduct.'" *Olmstead v. Newman (In re Newman)*, No. 07-8050, 2008 WL 867756, at *5 (B.A.P. 6th Cir. Mar. 28, 2008) (citing *American Honda Fin. Grp. v. Grier (In re Grier)*, 124 B.R. 229, 232 (Bankr. W.D. Tex. 1991)).

Trapp says he stopped remitting the funds to VCG to pay ordinary or necessary business expenses and vendors. While those payments are business expenses, the calculation of the daily ACH payments considered the average

19

percentage of receipts needed in the food industry for operating expenses. VCG testified that was the basis in the agreements for the calculation of the daily payments to VCG. While Trapp may have been desperate to continue his businesses, and he concluded that not paying VCG might permit him to do so, that is not a fair or honorable justification for his actions. The refusal of Trapp to make payments to VCG had no legitimate justification. He was neither fair nor honorable in his dealings with VCG. Waiting mere weeks before stopping payments and then using the funds to pay RAM and taxes that would be a personal liability reinforce the conclusion that there was no valid reason for Trapp's actions. This conclusion is further reinforced by Trapp's actions of trying and succeeding in borrowing more money and pledging or selling receipts to yet another party. Thus, there is no basis for this exception. Trapp's conduct establishes the requirements for nondischargeability under 11 U.S.C. § 523(a)(6). The obligations are nondischargeable under 11 U.S.C. § 523(a)(6).

### Conclusion

The debt owed to Velocity Capital Group in the amount of $93,310, consisting of the unpaid amount of Receipts plus the contractual default fees, is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (a)(6).

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order and judgment consistent with this decision will be entered.

Dated:  May 5, 2022

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge